In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1551

JIMMY D. BRIDGES,

*Plaintiff-Appellant,*

*v.*

TIM GILBERT, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06-C-544-S—**John C. Shabaz**, *Judge.*

ARGUED MAY 6, 2008—DECIDED MARCH 4, 2009

Before EASTERBROOK, *Chief Judge*, and WOOD and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Jimmy Bridges, an inmate at the
Wisconsin Secure Program Facility, witnessed events
leading to the death of a fellow inmate. After he assisted
the inmate's mother by providing an affidavit in a wrong-
ful death lawsuit against prison officials, Bridges
perceived that certain prison officials and guards (to
whom we refer collectively as "Defendants") had begun to
harass him. He filed a pro se § 1983 action alleging that

the Defendants retaliated against him for exercising his First Amendment rights and prevented him from petitioning the government for redress of grievances. The district court dismissed the complaint for failure to state a claim.

## I. Background

Because this appeal is taken from the district court's dismissal of the complaint for failure to state a claim, we consider as true the facts alleged in the complaint. *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Fin. Servs., Inc.*, 536 F.3d 663, 666 (7th Cir. 2008). Bridges was housed in the Wisconsin Secure Program Facility in a cell adjacent to inmate Donnie Powe. On the night of March 14, 2003, Bridges yelled through a vent to greet Powe. Powe complained to Bridges that his drinking cup contained a terrible smell, and he had been vomiting. A nurse brought Powe some Tylenol and Tums. The next morning, Bridges called through the vent again to check on Powe. Powe responded in a weak voice that he was really sick, his body was hurting all over, and he could not eat. Later, a correctional officer asked Powe whether he could hand his meal tray to the officer, but Powe did not respond. Several different officers repeated the question over the next few hours, but Powe never answered. The officers eventually called another nurse to check on Powe. Around the same time, other correctional officers also came to Powe's cell, and Powe told them he was in terrible pain and could not move. A group of at least four officers threatened to "suit up" on him, i.e., to beat

him, for not responding. About 45 minutes later, prison staff extracted Powe from his cell in a restraint chair and took him to be monitored in the Health Services Unit. Powe died the following day.

Powe's mother Eunice brought a wrongful death suit against several prison employees, and her attorneys interviewed Bridges in March 2005 as a witness to the care Powe received while in his cell. Bridges provided an affidavit and agreed to testify if the case went to trial. He was informed that his affidavit had been used by the attorneys in a summary judgment response filed in April 2005, and later he learned that the parties had reached a settlement agreement.

Bridges believes that Defendants began a campaign of harassment against him in retaliation for his participation in the Powe lawsuit. From March to December 2005, certain Defendants caused his incoming and outgoing mail to be delayed. One Defendant often kicked his cell door, turned his cell light off and on, and opened his cell trap and slammed it shut to startle him when he was sleeping. He complained to her in November 2005, and in response, she filed an unjustified disciplinary charge against him. Another Defendant upgraded that unjustified charge to a "major offense," indicating that his conduct created a risk of serious disruption at the prison. Bridges was later cleared of any wrongdoing in connection with the disciplinary charge.

Bridges filed several grievances in response to these incidents, and he believes the retaliation continued through improper treatment of his grievances. A few examples—

Defendants found technical reasons to repeatedly reject his grievances, such as alleging too many issues in a single grievance or not alleging enough facts to support the issues; Defendants falsely stated that his grievance appeal had not been filed within the required time period and dismissed it; and Defendants failed to perform investigations on his grievances or provided misleading information in their responses.

On September 22, 2006, Bridges filed a pro se § 1983 action with the district court, claiming that the Defendants retaliated against him for exercising his First Amendment rights to free speech and to petition for redress of grievances, and also prevented him from filing grievances. The district court screened the complaint under 28 U.S.C. § 1915A and dismissed the claims against five Defendants because Bridges had not alleged facts to support claims against them.[1] The remaining nine Defendants filed a motion to dismiss under Rule 12(b)(6) for failure to state a claim and for Bridges's failure to exhaust his administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Citing *Brookins v. Kolb*, 990 F.2d 308 (7th Cir. 1993), the district court concluded that Bridges did not

---

[1] 28 U.S.C. § 1915A requires a district court to review a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity and dismiss the complaint (or a portion thereof) if the complaint is frivolous, is malicious, or fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief.

state a claim because he did not engage in protected First Amendment activity. He filed an affidavit in a wrongful death lawsuit that was personal to Powe—which did not rise to the level of a public concern so as to constitute protected conduct. Because the court concluded that he did not engage in protected activity, the court declined to address whether Bridges had exhausted his administrative remedies. Bridges appeals from the Rule 12(b)(6) ruling but does not challenge the dismissal of five Defendants under § 1915A.

## II. Discussion

We review a district court's grant of a motion to dismiss for failure to state a claim de novo. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). To satisfy the notice-pleading standard, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide the defendant with "fair notice" of the claim and its basis. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)); Fed. R. Civ. P. 8(a)(2). The complaint "must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City*, 536 F.3d at 668 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). However, we construe pro se complaints liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Erickson*, 127 S. Ct. at 2200 (citation omitted); *Obriecht v. Raemisch*, 517 F.3d 489, 492 n.2 (7th Cir. 2008).

## A. Bridges's Free Speech Claim

To prevail on a First Amendment retaliation claim, Bridges must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the Defendants' decision to take the retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). Bridges's complaint alleged that Defendants retaliated against him for participating in the Powe lawsuit. The district court determined that Bridges's complaint failed to state a claim because his allegations, taken as true, would not satisfy the first element, that he had engaged in activity protected by the First Amendment. In reaching this conclusion, the district court relied on the free speech discussion from our decision in *Brookins*.

In *Brookins*, a prison inmate filed a § 1983 complaint claiming that prison officials had retaliated against him by removing him from his position co-chairing a prison-approved group called the Paralegal Base Committee (which assisted inmates with legal research and preparing legal documents) and then transferring him to another facility. The retaliation occurred after Brookins wrote a letter, written on official Committee letterhead and sent to various prison officials, requesting that all security staff involved in filing negative conduct reports against a certain inmate be given polygraph examinations prior to the inmate's disciplinary hearing. He also

offered to pay for the exams from the funds of the Committee. Under the prison's regulations, Brookins should have requested permission from the Committee's advisor prior to sending the correspondence; he also should have had the Committee's advisor co-sign the request, since it purported to authorize spending of Committee funds. Brookins did neither. As a result, he was removed from the Committee and transferred to another prison shortly thereafter.

Brookins asserted a violation of his First Amendment associational right to act on behalf of the other prisoners. We explained that a prisoner's constitutional rights, particularly associational rights, are necessarily curtailed by imprisonment. *Id.* at 312-13. We concluded that Brookins had not satisfied his burden on summary judgment to demonstrate that the prison officials, in reacting to Brookins's violation of the regulations, "exaggerated their response to preserving the legitimate penological objectives of the prison environment." *Id.* at 313. Brookins also claimed that his letter implicated his free speech rights, but we rejected his argument because "he ha[d] not demonstrated that the speech contained in his letter rose to the level of protected speech. Brookins did not write the letter to inform the prison officials about a prison issue that was a matter of public issue or concern." *Id.* For support, we cited to Justice Stevens's concurring opinion in *RAV v. City of St. Paul, Minn.*, 505 U.S. 377, 420-21 (1992) (Stevens, J., concurring) and its discussion of the concept that the First Amendment is defined by the content of the speech in question; for example, "[s]peech about public officials or matters of

public concern receives greater protection than speech about other topics."

Since *Brookins*, we have discussed the "public concern" standard in the context of prisoner speech on other occasions. In *Sasnett v. Litscher*, 197 F.3d 290, 293 (7th Cir. 1999), we held that a regulation that permitted prisoners to wear rosaries but not cross necklaces discriminated against Protestants and violated the First Amendment. The prisoners also brought a separate free speech claim which we rejected because, although wearing a cross is "in a sense expressive," to bring the claim under the free speech clause would "empty the free-exercise clause of a distinctive meaning." *Id.* at 292. The prisoners' desire to wear crosses was not done to convert other inmates or make a public statement and so the free speech claim failed by analogy to the *Pickering-Connick* "public concern" line of cases. *Id.* (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983)).

In *McElroy v. Lopac*, 403 F.3d 855 (7th Cir. 2005) (per curiam), a prisoner who lost his job in the prison's sewing shop asked whether he would receive "lay-in pay" while awaiting transfer to the optical glass shop. Annoyed by the inquiry, prison officials allegedly filed false disciplinary charges against McElroy and refused to reassign him to the glass shop. We rejected McElroy's claim of First Amendment retaliation, concluding that his inquiries about lay-in pay "were a matter of 'purely individual economic importance' and not of public concern." *Id.* at 858 (quoting *Balton v. City of Milwaukee*, 133 F.3d 1036, 1040 (7th Cir. 1998)).

Our most recent mention of *Brookins*'s public concern standard was in *Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006), in which a prison official, citing *Brookins*, argued that complaints about the use of shackles in group therapy and the denial of yard time were not protected by the First Amendment. We rejected the official's reliance on *Brookins* because, even assuming that Pearson's speech was subject to a public concern test, his complaints urging a change in prison policy met that test. *Id.* at 740. *Pearson* did not, however, endorse *Brookins*'s public concern requirement for prisoner speech—the validity of that test was not an issue.

Bridges notes that the concept of a public concern test for prisoner speech has caused considerable confusion in the district courts of this circuit. *See, e.g., Watkins v. Kasper*, 560 F. Supp. 2d 691, 702 (N.D. Ind. 2008) ("It is not readily apparent how imposing the requirement that prisoner speech be related to a matter of public concern in order to state a First Amendment retaliation claim serves to strike the appropriate balance between a prisoner's speech interests and a prison's penological interests. Nonetheless, there is Seventh Circuit case law suggesting that the public concern requirement that was developed in the public employee context is applicable in the prison context as well."). At Bridges's urging, we take up the matter now.

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Like students who do not shed their free speech rights at the schoolhouse gates, *Tinker*

*v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), neither do prison walls "form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

The Supreme Court has addressed the scope of prisoners' First Amendment rights on several occasions. In *Pell*, journalists and prison inmates challenged a prison regulation preventing face-to-face interviews between the media and individual prisoners. The Court noted that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822. Legitimate penological objectives include crime deterrence, prisoner rehabilitation, and internal prison security. *Id.* at 822-23. If prison officials have identified an institutional need that a regulation helps to solve, that decision is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 827. With respect to the regulation prohibiting face-to-face interviews, "institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the

corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, . . . in drawing such lines, 'prison officials must be accorded latitude.'" *Id.* at 826 (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)). Accordingly, the Court upheld the regulation. *Id.* at 828.

In *Turner*, the Supreme Court considered regulations relating to inmate marriages and correspondence between inmates at different institutions. After a discussion of previous decisions on prisoners' free speech rights, the Court crystalized the test to be used: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Several factors are relevant in reaching a determination, such as whether there is a connection between the regulation and a valid and neutral government interest; whether there are alternative means of exercising the constitutional right; and the impact that accommodation of the asserted right will have on guards, inmates, and the allocation of prison resources. *Id.* at 89-90. The court concluded that the restriction on inmate correspondence with inmates in other facilities was reasonably related to legitimate penological interests, but the marriage restriction was not. *Id.* at 91, 97.

In *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001), the Supreme Court rejected the notion that inmate-to-inmate correspondence that contained legal advice enhanced

the protections otherwise available under *Turner*, a case that "adopted a unitary, deferential standard for reviewing prisoners' constitutional claims." The Court noted that "[t]o increase the constitutional protection based upon the content of a communication first requires an assessment of the value of that content. But the *Turner* test, by its terms, simply does not accommodate valuations of content." *Id.* at 230.

*Pell*, *Turner*, and *Shaw* dealt with the constitutionality of prison regulations that implicated prisoners' First Amendment rights. *See also Thornburgh v. Abbott*, 490 U.S. 401 (1989) (considering regulations on prisoners' receipt of publications); *Jones v. N. C. Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977) (considering regulations relating to prisoners' unions). The cases did not explicitly mandate—nor did they exclude—the *Turner* test for claims of unconstitutional retaliation for the exercise of free speech. The Supreme Court has, however, developed a standard for assessing unconstitutional retaliation in another context—the public employee setting.

In *Pickering*, a public school teacher was dismissed from his position after writing a letter containing some erroneous statements, as well as criticism of the school board's past handling of revenue-raising proposals. The letter was published in a local newspaper. The Court described the significant public interest in citizens having "free and unhindered debate on matters of public importance," *Pickering*, 391 U.S. at 573, which must be balanced with the State's interest as an employer in "promoting the efficiency of the public services it performs through its

employees," *id.* at 568. The case did not present a situation in which the teacher's speech interfered with his performance of his duties as a teacher or the operation of the school generally. *Id.* at 572-73. Accordingly, the Court held that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574.

In *Connick*, an assistant district attorney distributed a questionnaire to other staff members about various office policies and attitudes in her department. Her research into the opinions of her co-workers was motivated by her objection to being transferred to work in another criminal court, but she was terminated when her supervisors learned of the questionnaire. The Court added a nuance to the *Pickering* test, holding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. Because the district attorney's speech was not intended to inform the public that her office was not fulfilling its responsibilities or to disclose potential wrongdoing, her speech was a matter of her own personal interest and did not constitute protected speech. *Id.* at 148.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), a deputy district attorney complained that he had suffered retalia-

tory actions at his job after he spoke to his supervisors and wrote memoranda about an affidavit used in obtaining a warrant in which he felt there were misrepresentations; he also testified for the defense as to his observations about the affidavit. The Court further clarified the *Pickering-Connick* standard by differentiating between speech made pursuant to the employee's official duties and speech made as a citizen. *Id.* at 421. "That consideration—the fact that [the employee] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes [this] case from those in which the First Amendment provides protection against discipline." *Id.*

With these cases in mind, we now turn to whether the public concern test should be applied in the context of prisoner speech. The public concern inquiry was created to maintain the delicate balance between a citizen's right to speak (and the public interest in having thoughtful debate) and the employer's need to effectively provide government services. The Supreme Court explained the employer's interest in *Garcetti*:

> When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can

> express views that contravene governmental policies or impair the proper performance of governmental functions.

*Id.* at 418-19 (internal citations omitted). Prisons officials also have a significant interest in operating effectively, but the concerns are of a very different nature. The legitimate penological objectives test was created to preserve some free speech rights for prisoners in a restrictive and challenging environment where prison officials must be focused on crime deterrence, prisoner rehabilitation, and internal prison security. And, obviously, a citizen has the choice to enter into public employment, while imprisonment is not voluntary. This is not to say that prisoners have greater free speech rights than public employees. A prisoner's speech can be circumscribed in many ways that a public employee's speech cannot, and the two tests for assessing protected speech account for those differences. The public employee cases distinguish between speech made as a citizen and speech made as an employee, but to draw a corollary in the prison context would be to remove protection from nearly everything a prisoner says. Shut off from the outside world, the prisoner's speech would nearly always be speech made "as a prisoner" rather than "as a citizen." To further limit protection to matters of public concern would seem to restrict prisoners' constitutional rights far more than is "justified by the considerations underlying our penal system." *Pell*, 417 U.S. at 822 (quoting *Price*, 334 U.S. at 285).

After engaging in a thoughtful discussion of the history of prisoner and public employee free speech cases, the

Sixth Circuit expressed doubt as to the propriety of using a public concern standard for prisoners' speech, *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (en banc), although the court ultimately left the question undecided, *see Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) ("[W]hether the public-concern test determines the protection to be afforded a prisoner's speech is an open question in the Sixth Circuit."). The Sixth Circuit's doubt was based upon the many differences between prisoners and employees: "Given the distinctive rights of the two types of plaintiffs, the separate interests of the two types of government entities, and the dissimilar nature of the relationship between the plaintiff and the government in these two settings, any honest attempt to perform the balancing prescribed by the Supreme Court in *Pickering* cannot unhesitatingly import reasoning from the public employment setting into the prison setting. . . . [C]ontext matters." *Thaddeus-X*, 175 F.3d at 393.

In *Eichenlaub v. Township of Indiana*, 385 F.3d 274 (3d Cir. 2004), the Third Circuit considered a case in which plaintiffs, who were private citizens, brought a claim of retaliation against the government; the district court had dismissed their claim because the speech was not a matter of public concern. The Third Circuit drew an analogy to prisoner speech:

> [O]utside the employment context the First Amendment forbids retaliation for speech even about private matters. For example, we have held that First Amendment claims may be based on allegations that a prisoner's complaint against

a guard caused retaliation. Realistically, these kinds of complaints are often highly particularized objections to alleged individual mistreatment. We do not, however, impose a "public concern" threshold.

*Id.* at 284 (citation omitted). *See also Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000) ("[W]e reject the contention . . . that where the [prisoner] alleges retaliation for protected speech in the form of a petition to the government, he must establish that the speech contained in his petition to the government was a matter of public concern." (internal quotation marks omitted)).

Other courts have simply applied the *Turner* test without consideration of a public concern requirement. For example, the Fifth Circuit applied the "legitimate penological objectives" test without fanfare: "While we deal here with [retaliation] rather than a [prison] regulation, the same standard is applicable to determine if the prison authorities' response to [plaintiff's] writing is constitutionally permitted." *Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989). *See also Cornell v. Woods*, 69 F.3d 1383, 1388 (8th Cir. 1995) ("[A prisoner's] right to respond to a prison investigator's inquiries is not inconsistent with a person's status as a prisoner or with the legitimate penological objectives of the corrections system.").

While there are different "rung[s in] the hierarchy of First Amendment values," *Carey v. Brown*, 447 U.S. 455, 467 (1980), we conclude that a prisoner's speech can be protected even when it does not involve a matter of public

concern.[2] We will apply the *Turner* legitimate penological interests test to determine whether Bridges has alleged that he engaged in protected speech.

Bridges alleged that he engaged in protected speech in the affidavit he filed in the lawsuit by Powe's mother. Providing an eyewitness account (or an aural account, as in this case) of an incident where prison officials are alleged to have mistreated an inmate who was gravely ill (and later died) is not inconsistent with legitimate penological interests. Prisons have an interest in keeping the inmates as safe and secure as possible while imprisoned, and truthful speech that describes possible abuses can actually be quite consistent with that objective. *Cf. Cornell*, 69 F.3d at 1388 ("[T]ruthfully answering questions concerning a misconduct investigation against a correctional officer is undoubtedly quite consistent with legitimate penological objectives." (internal quotation marks omitted)). Bridges has therefore adequately alleged, for purposes of surviving a motion to dismiss, that he engaged in activity protected by the First Amendment. *Woodruff*, 542 F.3d at 551 (quoting *Massey*, 457 F.3d at 716). Whether his claim is meritorious is a question that can be explored in discovery and, if necessary, at trial.[3]

---

[2] Because this opinion disavows the public concern test used in prior prisoner speech cases in this circuit, it has been circulated among all judges of this court in regular active service under Circuit Rule 40(e). No judge favored a rehearing en banc.

[3] This case does not address the continuing validity of cases like *McElroy*, where we concluded that a prisoner-employee's

(continued...)

We briefly turn to the other two elements of a First Amendment retaliation claim, which were not addressed by the district court—whether Bridges experienced an adverse action that would likely deter First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in the Defendants' decision to take the retaliatory action. *Id.* Bridges alleged that he suffered retaliation through delays in his

---

[3] (...continued)
complaints about compensation were not matters of "public concern" protected by the First Amendment. 403 F.3d at 858. To the extent that a distinction can be made between speech as an inmate and speech as a prisoner-employee, the public concern standard may still have some application to prisoners' free speech claims. Although we noted above that *Garcetti*'s analysis of the competing interests of the public employer and the public employee is generally inapplicable to the prison context, perhaps similar concerns are present when prison officials offer inmates voluntary employment in the provision of prison services. The official interest in the "efficient provision" of those services, coupled with the benefits to the prisoner from taking the job, may justify a public concern limitation on the prisoner's speech made as an employee. *Garcetti*, 547 U.S. at 418. On the other hand, the degree of control exercised by officials over all aspects of a prisoner's life may make any distinction between speech as an inmate and speech as a prisoner-employee unworkable. *Cf. id.* at 418-19 (comparing the free citizen's dual roles as a public employee and a private citizen). We need not decide in this case whether the public concern standard ought to apply to a prisoner-employee's free speech claim because, in providing an affidavit in the Powe lawsuit, Bridges was not speaking as a prisoner-employee.

incoming and outgoing mail; harassment by a guard kicking his cell door, turning his cell light off and on, and opening his cell trap and slamming it shut in order to startle him when he was sleeping; unjustified disciplinary charges; and improper dismissal of his grievances. Even though some of these allegations would likely not be actionable in and of themselves, if the acts were taken in retaliation for the exercise of a constitutionally protected right, then they are actionable under § 1983. *See Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) ("[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper."); *see also Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996) (per curiam) (retaliatory transfer of a prisoner); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (retaliatory delay in transferring prisoner); *Cornell*, 69 F.3d at 1389 (retaliatory discipline).

Bridges's complaint does not specifically allege that the retaliatory activities would "deter a person of ordinary firmness" from exercising First Amendment activity in the future. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). But construing his pro se complaint liberally, *Obriecht*, 517 F.3d at 492 n.2, and accepting all of his allegations as true, one "possible inference[]" of the complaint, *Tamayo*, 526 F.3d at 1081, is that the alleged harassment by numerous prison employees in a variety of ways over a period of several months would deter a person of ordinary firmness from exercising his First Amendment rights. Again, whether Bridges's allegations are in fact true or whether the alleged harassment would actually deter a

person of ordinary firmness are not questions that we address at the pleading stage.

Finally, Bridges alleges that the Defendants would not have harassed him but for his participation in the Powe lawsuit. That, too, is sufficient. Bridges has stated a claim for free speech retaliation. Pl. Compl. ¶¶ 10-16, 25.

### B. Bridges's Access to the Courts and Petition for Redress Claims

Bridges alleged three other claims in his complaint. First, intertwined with his free speech claim, Bridges claimed the Defendants retaliated against him for filing an affidavit in the Powe lawsuit in violation of his constitutional right to access the courts. Second, he claimed that one Defendant retaliated against him by filing an unjustified disciplinary charge after he complained about her harassment of him—and another Defendant modified the charge to be more serious—in violation of his right to petition the government for redress of grievances. Third, he claimed the Defendants improperly denied and rejected his grievances, which violated his right to petition the government for redress of grievances. Though he specifically labeled paragraphs in his complaint with these claims and addressed them in his reply to Defendants' motion to dismiss, the district court dismissed the complaint without independent discussion of these claims.

As with the free speech claim, to prevail in an access to the courts or petition for redress of grievances retaliation claim, Bridges must ultimately show that (1) he engaged

in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the Defendants' decision to take the retaliatory action. *Woodruff*, 542 F.3d at 551 (quoting *Massey*, 457 F.3d at 716).

The First Amendment right to petition the government for redress of grievances includes the right of access to the courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1294 n.5 (7th Cir. 1996). "[P]ersons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'" *Cruz*, 405 U.S. at 321 (quoting *Johnson v. Avery*, 393 U.S. 483, 485 (1969)); *cf. Woodruff*, 542 F.3d at 561 (Posner, J., concurring) (emphasizing that the right to petition includes a *reasonable* right of access to the courts). While the right of access to the courts requires prison officials to provide prisoners with the necessary tools "to attack their sentences, directly or collaterally," and "to challenge the conditions of their confinement," *Lewis v. Casey*, 518 U.S. 343, 355 (1996), it is not an abstract, freestanding right to legal assistance, *id.* at 351. A prisoner asserting a denial of access claim must show an "actual injury" in the form of interference with a "nonfrivolous legal claim." *Id.* at 353. "In other words, the right of access to the courts is tied to and limited by a prisoner's right to 'vindication for a separate and distinct right to seek judicial relief for some wrong.'" *Lehn v. Holmes*, 364

F.3d 862, 865 (7th Cir. 2004) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).

Bridges has no "underlying claim" that implicates his own right of access to the courts. *Harbury*, 536 U.S. at 415. The only underlying claim in this case is the Powe wrongful death lawsuit, meaning that retaliation against Bridges for providing an affidavit in that lawsuit could only affect the access rights of Powe's mother. But Bridges cannot rely on another plaintiff's injury in support of his own denial of access claim. *See Casey*, 518 U.S. at 357-58 (concluding that the loss of nonfrivolous legal claims by two individual prisoners did not establish the requisite injury for an entire class of prisoners to seek systemwide improvements in the prison's legal assistance program). Since Bridges has no "right to judicial relief" distinct from Powe's claim, *Harbury*, 536 U.S. at 415, his affidavit in the Powe litigation was not a constitutionally protected exercise of his right to access the courts.

We have in the past recognized situations where one prisoner may have a First Amendment retaliation claim based on the denial of another prisoner's right of access to the courts. In *Higgason*, a prisoner argued that he was transferred to another prison facility after he filed his own lawsuits and assisted other inmates with filing lawsuits. We held that "[i]f a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under § 1983." *Higgason*, 83 F.3d at 810. Importantly, however, Higgason was a "jailhouse lawyer," *id.* at

811 n.3, and we have acknowledged that these advocates have standing to assert their fellow inmates' denial of access claims, *see Buise v. Hudkins*, 584 F.2d 223, 227 (7th Cir. 1978). Without that standing, prison officials could simply transfer troublesome jailhouse lawyers and leave the remaining inmates "without an alternate means of access to the courts." *Id.* at 228; *see also Johnson v. Avery*, 393 U.S. 483, 487 (1969) (invalidating a prison regulation prohibiting habeas petitioners from obtaining the assistance of a jailhouse lawyer).

Unlike the services of a jailhouse lawyer, we do not think that Bridges's assistance as an affiant-witness was "necessary to vindicate [Powe's] right of access to the courts." *Thaddeus-X*, 175 F.3d at 395. That is especially true since Powe's mother has already obtained and used Bridges's affidavit in her lawsuit, suggesting that she suffered no injury through the alleged retaliation against Bridges. *See Massey v. Helman*, 196 F.3d 727, 740 (7th Cir. 1999) (commenting that a prison physician who gave a deposition in a prisoner lawsuit could not show "that his termination interfered with other prisoners' access to the courts by confining their ability to gather evidence in support of their cases"). Accordingly, Bridges's participation in the Powe litigation was not sufficiently connected to Powe's rights to allow Bridges to assert a denial of access claim. *See id.* at 739-40 (holding that the prison physician lacked standing to raise the prisoners' rights of access to the courts). The district court properly dismissed Bridges's claim alleging retaliation for exercising his right to access the courts.

Moving to Bridges's next claim, Bridges alleges that one Defendant retaliated against him for exercising his constitutional right to seek redress for the Defendant's harassment. Bridges contends that he communicated a grievance to the government when he threatened the Defendant that he was going to file a grievance against her because it was inappropriate for her to kick his cell door, turn his lights on and off, and slam his cell trap while he was sleeping. Bridges cites *Pearson*, in which we "decline[d] to hold that legitimate complaints lose their protected status simply because they are spoken. Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Pearson*, 471 F.3d at 741. But it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance. Even if the threat were deemed protected activity, Bridges's allegations do not lead to an inference that the retaliation would deter a person of ordinary firmness from exercising First Amendment activity in the future. Bridges alleges that the Defendant filed an unjustified disciplinary charge, which another Defendant upgraded to a "major offense." The charge was later dismissed. A single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action. *Cf. Bart*, 677 F.2d at 625 ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always action-able no matter how unlikely to deter a person of ordinary firmness from that exercise . . . ."). This claim was properly dismissed. Pl. Compl. ¶¶ 17-20.

Bridges's final claim is that the Defendants improperly dismissed and rejected his attempts to file administrative grievances. This is his only claim that does not arise under a retaliation theory; he complains of a direct violation of his right to petition the government for redress of grievances. He alleges that the Defendants used technicalities to repeatedly reject his grievances. For example, they would claim that he had stated too many issues in one grievance when Bridges was merely attempting to explain the context of the grievance; then when he filed another grievance, they would claim that he had not given them enough background information. The rejected grievances were "directly related to the claims stated in [Bridges's] complaint." Pl. Compl. ¶ 21. He did not allege that he was prevented from petitioning for redress of any other grievances. Section 1983 is a tort statute, so Bridges must have suffered a harm to have a cognizable claim. *Doe v. Welborn*, 110 F.3d 520, 523 (7th Cir. 1997). Because he is currently exercising his right to petition the government for redress of grievances through this lawsuit, he has not been harmed. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) ("[Plaintiff's] invocation of the judicial process indicates that the prison has not infringed his First Amendment right to petition the government for a redress of grievances."). This claim was also properly dismissed. Pl. Compl. ¶¶ 21-24.[4]

---

[4] Bridges's allegations may later become relevant, however, because the Prison Litigation Reform Act requires that he exhaust his available administrative remedies before he can

(continued...)

### III. Conclusion

Because Bridges stated a claim for free speech retaliation due to his filing of an affidavit in the Powe litigation, Pl. Compl. ¶¶ 10-16, 25, we REVERSE the decision of the district court in part. With respect to Bridges's claims of retaliation for access to the courts, retaliation for threatening to file a grievance, Pl. Compl. ¶¶ 17-20, and denial of the grievance process, Pl. Compl. ¶¶ 21-24, 26, we AFFIRM the district court's dismissal.

---

[4] (...continued)

bring a § 1983 action. 42 U.S.C. § 1997e(a). If Bridges submitted grievances that did not comply with the prison's procedural requirements, then the prison was entitled to reject those grievances. And to file a claim, his administrative remedies must have been *properly* exhausted. *Woodford v. Ngo*, 548 U.S. 81, 95 (2006) ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."). Bridges alleges, though, that his grievances met the procedural requirements but were nevertheless denied. If the district court later determines that Bridges has not exhausted his administrative remedies, the court may need to determine whether that failure was attributable to the alleged denial of the grievance process.

---