In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2588

MONWELL DOUGLAS,

*Plaintiff-Appellant,*

*v.*

FAITH REEVES,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:16-cv-00368-JMS-DLP — **Jane Magnus-Stinson**, *Chief Judge.*

ARGUED MAY 13, 2020 — DECIDED JULY 7, 2020

Before FLAUM, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In this suit under 42 U.S.C.
§ 1983, plaintiff Monwell Douglas, an Indiana prisoner,
claims that defendant Faith Reeves, his casework manager, re-
taliated against him for activity protected by the First Amend-
ment. Douglas asserts that after he successfully appealed a
prison disciplinary sanction, Reeves punished him for taking
the appeal by refusing to restore benefits he had lost as a re-

sult of discipline. The district court granted summary judgment to Reeves. We affirm because no reasonable jury could conclude that Reeves inflicted deprivations on Douglas likely to deter a person of ordinary firmness from engaging in First Amendment activity.

I.  *Factual and Procedural Background*

We review the grant of summary judgment de novo and construe all facts and reasonable inferences in favor of Douglas, the non-moving party. *Daugherty v. Page*, 906 F.3d 606, 609 (7th Cir. 2018). The events leading up to this lawsuit began on February 16, 2016, when a nurse accused Douglas of threatening her during a trip to the infirmary.[1] Based on this accusation, Douglas was convicted of a disciplinary offense on February 24. But Douglas appealed, and on March 14, the prison's superintendent overturned the conviction for lack of evidence. In the meantime, the conviction had affected Douglas adversely in several ways. He was placed in "segregation" housing, losing the cell he was used to. He also lost his job as a "wheelchair pusher" and stopped receiving wages.

---

[1] Our account of the facts draws on all of Douglas's pro se filings at summary judgment. Douglas concedes on appeal that the district court could have disregarded portions of his summary judgment submissions that were not supported by his affidavit or other admissible evidence. Appellant's Br. at 3 n.2; see Fed. R. Civ. P. 56(c). Reeves did not object to any of his factual assertions in the district court, however, and she cites them at several points on appeal. We will assume that all of Douglas's filings could be supported by admissible evidence. See *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018) ("Neither the rules of evidence nor the rules of civil procedure require lawyers or judges to raise all available evidentiary objections.").

After his successful appeal, Douglas was returned to the normal cell block on March 23, though not to his original cell. That day, he wrote to Reeves asking to get back what he had forfeited due to the overturned sanction. He followed his request with an "informal grievance" on March 28 and a "formal grievance" on April 6. With some variations, these documents demanded three remedies: (1) return to his old cell; (2) reinstatement to his old job or a better one; and (3) backpay from his suspension through his return from segregation.

Although Douglas eventually received a new job and backpay, prison officials did not make Douglas whole to his full satisfaction. (We discuss his specific complaints in more detail below.) After lodging several more grievances against various officials, he filed this lawsuit against nine defendants alleging violations of the First, Fourth, Fifth, and Sixth Amendments. The district court screened the complaint under 28 U.S.C. § 1915A(b) and allowed only the First Amendment claim against Reeves to go forward. Later, the district court granted summary judgment on this remaining claim. Douglas appeals the grant of summary judgment. He does not challenge any aspect of the screening order.

II. *Analysis*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a factual dispute is genuine turns on whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish a prima facie case of unlawful retaliation, a plaintiff must show "(1) he engaged in activity protected by the First Amendment; (2) he

suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). These basic elements are the same whether the plaintiff is a prisoner, a public employee, or any other person alleging that a government official targeted protected activity. See *Bridges*, 557 F.3d at 546 (prisoner); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (public employee); *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (healthcare corporation). As we will see, however, the specific contours of each element can vary depending on the context.

There is no question that Douglas engaged in activity protected by the First Amendment. Reeves concedes that he did so three times: his February 25 administrative appeal of his disciplinary sanction, his March 28 informal grievance, and his April 6 formal grievance. Appellee's Br. at 13. We agree with the parties that administrative appeals of prison discipline, like grievances against prison officials, fall within the First Amendment's protections. "A prisoner has a First Amendment right to make grievances about conditions of confinement." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012), quoting *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010); see also *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996) ("The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, as well as the right to be free from retaliation for exercising this right." (citation omitted)).

Douglas also presented enough evidence in the district court to create a dispute of material fact on the causal link be-

tween his protected activity and alleged deprivations. Douglas averred that, on March 25, Reeves bluntly denied his requests to be made whole after his successful appeal. She told Douglas, "just because your sanction was overturned doesn't mean [you're] not guilty," and then told him, "your job has been filled; I'm not moving you to any other cell; [you're] not getting any back pay." Reeves admitted in an interrogatory response that she was "generally aware" of the charge that Douglas had threatened a nurse by mid-March, before the alleged deprivations. Drawing reasonable inferences in Douglas's favor, a jury could conclude that Reeves still believed he was guilty and desired to punish Douglas for exercising his right to appeal.

But even if Reeves was harboring a grudge, none of the deprivations Douglas identified in the district court would likely deter First Amendment activity. "We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). As Douglas correctly points out, the district court relied in part on the irrelevant circumstance that Douglas "continued to file additional grievances," so "his First Amendment activity was not, in fact, deterred." *Douglas v. Reeves*, No. 2:16-cv-00368-JMS-DLP, 2018 WL 3219399, at *4 (S.D. Ind. July 2, 2018). The standard is objective, so a specific plaintiff's persistence does not undermine his claim. Cf. *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (observing that the standard "does not hinge on the personal experience of the plaintiff"). In fact, a contrary rule would stymie every First Amendment retaliation suit: Only plaintiffs who refuse to be silenced make their way to federal court. See *Van De*

*Yacht v. City of Wausau*, 661 F. Supp. 2d 1026, 1034 (W.D. Wis. 2009) (explaining this potential Catch-22).

Despite this misstep, the district court ultimately held correctly that "no reasonable jury could find that any of Ms. Reeves' conduct would deter a person of ordinary firmness from filing future grievances." *Douglas*, 2018 WL 3219399, at *4. On this basis, we affirm the grant of summary judgment. Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, we can resolve the issue as a matter of law. See *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise … ."). Douglas did not provide evidence of any deprivation inflicted by Reeves that can clear this hurdle in the prison context.

Douglas's first complaint was that Reeves refused to return him to the cell where he lived before being moved to segregation. His original cell was on the left wing of "P Unit"; after his return, he was assigned to a cell on P Unit's right wing. Douglas has not identified any material difference between these cells or wings. His complaints to prison officials focused instead on the dignitary harm of being forced to move even though he was innocent. His chagrin is understandable but not enough to launch and sustain a First Amendment claim. In *Holleman*, 951 F.3d 873, decided after briefing in Douglas's appeal, we explained that a transfer from one prison to another, on its own, "[w]ithout some additional aggravating factor, such as relocation to a much more restrictive or dangerous environment," is not likely to deter protected

activity. *Id.* at 882. The same logic applies to a move from one cell to another, which can happen for many reasons outside the control of the prisoner. In a supplemental authority letter, Douglas concedes that his claim based on the cell transfer is not viable after *Holleman*.

Douglas also complained that, having lost his prison job as a wheelchair pusher, he was denied an adequate replacement position. Douglas expressed his desire to resume paid work immediately on his return, asking "to be reclassed into my old job or a higher paying position." Reeves told him that the wheelchair job had been filled in his absence. She then assigned him to an "in-dorm recreation box" job, starting on April 20, that paid the same wage as the wheelchair job. Douglas told the district court he would have preferred a third position, in the prison laundry, which also paid the same and became available in mid-April. Douglas asserted that the wheelchair and laundry jobs had intangible advantages over the recreation job. Although he did not explain what any of the jobs entailed, he claimed that the recreation job came with "no factual responsibility," that it was "remedial," and that its prior holder was "mentally impaired." More generally, in an April 21 grievance, Douglas complained that he was "over qualified for all available possible, and current positions" in light of his academic and vocational credentials.

As with the different cell assignments, Douglas has failed to show any disparities among these three positions sufficient to deter a *prisoner* of ordinary firmness. It is not enough that Douglas felt slighted by the recreation placement. He needed to point to a deprivation with some significant deterrent effect in the prison context. We acknowledge that, for public employees, even relatively minor personnel actions can chill First

Amendment activity. See *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) ("The First Amendment requires a deprivation 'likely' to deter free speech, a standard considered more lenient than the Title VII counterpart of adverse action."); see also *Power v. Summers*, 226 F.3d 815, 820–21 (7th Cir. 2000) (same). But prison work assignments are not the same as ordinary public employment. The Indiana Department of Correction policy on work assignments explains that prison work is meant "to complement the security and operation of a facility" as well as to "assist in the offender's transition to the community." In other words, the purposes of these programs remain penological, even if prisoners also draw very modest wages.

For that reason, not every deprivation sufficient to deter a public employee, whose career and livelihood are at stake, would necessarily deter a prisoner on work assignment. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Holleman*, 951 F.3d at 880–81, quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). Here, Douglas needed to provide evidence of something more than subjective discontent with his assigned job. A public employee might base a First Amendment claim on "a transfer to a less desirable position" even if the advantages of the original position were largely intangible. *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997); see *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) (holding "transfer to a more physically demanding and less skilled post and an unfavorable change in schedule" could deter). But a prisoner needs to show a more concrete difference between the positions, whether in pay, working conditions,

or side benefits. Douglas has not explained what about the assignment to the recreation job would chill protected activity.

Douglas did point to one instance where, he argues, Reeves prevented him from obtaining an objectively better job. On March 30, the supervisor of the prison sanitation program told Douglas that a recycling apprenticeship was available there. The supervisor instructed Douglas to have Reeves contact the supervisor so that Douglas could be "reclassed to his program job status." Reeves then refused to do so, stating, "I'm not contacting nobody. I'm going to give you the job I want you to have." Douglas asserted that the recycling apprenticeship would have entitled him to a higher wage and a six-month credit toward his sentence. The denial of a prison job that would impart such palpable benefits could certainly deter First Amendment activity. See *McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005) (assuming that taking away a prisoner's job could amount to a constitutional deprivation); *DeWalt v. Carter*, 224 F.3d 607, 618–19 (7th Cir. 2000) (holding job removal stated retaliation claim), abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc).

But Douglas's own account of these events shows that Reeves did not deny him the recycling apprenticeship. Reeves had authority over the assignment of only nine positions, all located in the right wing of P Unit. They did not include the recycling apprenticeship, which according to Douglas belonged to the prison's sanitation program. In fact, prison officials explained Reeves's limited authority in response to a May 6 grievance: "You are not entitled to [a higher-paid] position. You may apply for a high paying position *by contacting the shop supervisor* after you are eligible to re-class to a new

position." (Emphasis added.) Thus, with respect to the recycling apprenticeship, Reeves's statement that she would "give you the job I want you to have" was, at worst, bluster. Under § 1983, "a public employee's liability is premised on her own knowledge and actions." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630 (7th Cir. 2017). Reeves—the only remaining defendant in this lawsuit—cannot be liable for denying Douglas a benefit she had no power to confer.

Finally, Douglas asserted that Reeves denied his request for backpay for the days he was unjustly furloughed. In his prison grievances and before the district court, Douglas argued that Reeves withheld money he was owed under the prison's policy on overturned sanctions. His initial complaints to prison officials sought wages from the date of his suspension through the date he returned to the cell block. On April 19, the prison credited his account with payments of $2.03 and $9.45, which Reeves asserted were the requested backpay. At summary judgment, Douglas disputed that assertion, suggesting that the payments came from some other source. He also declared that Reeves told him on March 25 that he would not be getting any backpay.

On appeal, Douglas presents a different version of the alleged backpay deprivation. No longer disputing that he received what he was owed, he reframes the deprivation as a March 25 *threat* by Reeves to withhold his backpay. Appellant's Br. at 23–24. Douglas is correct, as a general matter, that not only actual harms but also threats of harm can deter First Amendment activity. See *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016). And we do not minimize the coercive nature of threats to withhold even small sums from prisoners,

who are usually paid very little.[2] But Douglas simply did not present a threat theory to the district court. His consistent view was that Reeves denied him money he deserved. Even though we construe his pro se filings generously, they did not raise the deprivation he now describes on appeal. See *Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004) ("As a general proposition, pro se litigants are subject to the same waiver rules as litigants represented by counsel."); *Provident Sav. Bank v. Popovich*, 71 F.3d 696, 699–700 (7th Cir. 1995) (same).

The judgment of the district court is AFFIRMED.

---

[2] The record reflects that inmate-workers in Douglas's job tier make 15 cents an hour, with the best-paid prisoners making 25 cents.