# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3105

CHARLES WATKINS,

*Plaintiff-Appellee,*

*v.*

BARBARA KASPER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 28—**Theresa L. Springmann**, *Judge.*

ARGUED OCTOBER 28, 2009—DECIDED MARCH 31, 2010

Before RIPPLE, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* In this civil rights case under
42 U.S.C. § 1983, we consider the scope of prisoners' First
Amendment rights to complain about prison conditions.
Charles Watkins, an inmate at Indiana's Miami Correc-
tional Facility ("MCF"), brought a § 1983 action against
Dr. Barbara Kasper, a librarian for the MCF's law library,
alleging that Kasper retaliated against him for exercising

his First Amendment right to criticize library policies. The case went to a trial before a jury, who heard the following evidence.

Around July 2003, Watkins got a job as an "offender law clerk" in the MCF's law library. Besides a salary of $1.25/day, the job offered the perks of more frequent access to the library and more space for Watkins to keep his personal legal materials. Watkins soon met Kasper, a Ph.D. in library science whom the MCF hired in August 2003. The MCF was expanding its library facilities and brought in Kasper to manage a second law library, but because the second library didn't open until some time after her arrival, Kasper started out in the same library as Watkins.

Watkins's and Kasper's working relationship was not ideal. Kasper disapproved of the law clerks' practice of helping other inmates prepare their own legal documents. In January 2004, she told the clerks to stop providing such legal assistance; instead, they were simply to help inmates locate the forms and sources that they needed to do their own legal work. Kasper also ordered the law clerks to remove their personal legal materials from the library, which needed to be cleaned in preparation for an accreditation inspection by the American Correctional Association.

Disappointed with the law clerks' continued failure to remove their property from the library, Kasper and other prison officials called the law clerks to a meeting on February 13. Kasper reiterated that the law clerks were to stop their prior practices of storing personal materials

in the library and giving legal assistance to other inmates. Watkins objected to the restriction on providing legal assistance, which, in his view, violated his constitutional rights and interfered with his ability to do his job of helping other inmates.

The day after the meeting, Kasper decided that she could no longer wait for the law clerks' cooperation in cleaning up the library. Since Watkins and the other law clerks had ignored multiple requests to remove their personal materials from the library, Kasper resolved to do it herself. Kasper enlisted several of Watkins's fellow inmates to assist with the cleanup, and when they came across Watkins's materials, the inmates suggested that Kasper summon Watkins to the library to remove them. Ignoring these suggestions, Kasper proceeded to box up Watkins's materials and, according to the inmates, throw some of them in the trash.

In addition to removing Watkins's personal materials from the library, Kasper wrote a negative job evaluation and conduct report based on Watkins's failure to remove them himself. She also recommended that Watkins be fired as an offender law clerk for this misconduct, and he was. For the next few weeks, Watkins had difficulty obtaining passes to visit the library to work on his state-court post-conviction proceedings. According to Watkins, Kasper instructed the offender in charge of preparing library passes not to grant them to Watkins, effectively denying him access to the library.

Despite this restricted library access, Watkins managed to obtain a pass to visit the library on February 26. At

that time, Watkins confronted Kasper and complained that some of his legal materials had been left in the library on a table where other offenders could rummage through them. He also pointed out that a few of his materials, including legal pamphlets and transcripts from his prior court proceedings, were missing. Watkins was none too subtle. During trial, Watkins admitted that he spoke to Kasper with a "loud and boisterous voice" and exaggerated hand gestures. Kasper testified that she felt threatened by Watkins and, accordingly, wrote up a conduct report against him for intimidation. In subsequent proceedings, the prison disciplinary board found Watkins not guilty of intimidation but guilty of the lesser offense of disorderly conduct.

The continued friction between Watkins and Kasper apparently didn't undermine Watkins's library skills, for Kasper rehired him as a law clerk on March 25, 2004. Still, the controversy between them was just beginning. In February 2005, Watkins brought this § 1983 suit against Kasper (and several other prison officials no longer parties to the case) for retaliating against his exercise of free speech. At trial, Watkins, proceeding *pro se*, argued that Kasper was angry at him for criticizing library policies and responded with a series of illegitimate disciplinary actions, including filing false work evaluations and conduct reports against Watkins, disposing of his personal legal materials, and denying him access to the library.

Kasper, of course, denied retaliating against Watkins's free speech. She testified that she wrote a negative job

evaluation and recommended firing Watkins because he failed to remove his materials from the library as ordered, not because he spoke out against her policies at the February 13 library meeting. She also denied disposing of Watkins's legal materials or restricting his access to the prison library, which she claimed she lacked the authority to do. As for the February 26 conduct report for intimidation, Kasper felt that this report was justified based on Watkins's threatening, unruly behavior in complaining about the placement of his legal materials in the library.

It seems that experience as an offender law clerk pays off in the courtroom; Watkins won. The jury found that Kasper retaliated against Watkins's First Amendment rights and awarded Watkins $150 in compensatory damages and $1000 in punitive damages. Kasper made two post-trial motions for judgment as a matter of law or a new trial under Federal Rule of Civil Procedure 50, which the district court denied. Kasper appeals, arguing that Watkins's speech during both the February 13 library meeting and February 26 confrontation with Kasper is unprotected as a matter of law, such that this speech cannot support Watkins's First Amendment retaliation claim.

We review de novo the district court's denial of Kasper's motion for judgment as a matter of law under Rule 50, but we will overturn the jury's verdict only if the record contains "no legally sufficient evidentiary basis" for a reasonable jury to find in favor of Watkins, the non-moving party. *Lasley v. Moss*, 500 F.3d 586, 590 (7th Cir. 2007)

(citation omitted). We review the denial of Kasper's motion for a new trial for an abuse of discretion. *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005).

To prevail on his § 1983 claim of First Amendment retaliation, Watkins had to prove that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future"; and (3) a causal connection between the two. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citation omitted). At issue in this case is the first requirement, that Watkins engaged in speech protected by the First Amendment. In *Bridges*, 557 F.3d at 551, we held that the question of whether a prisoner's speech is protected is governed by the standard established in *Turner v. Safley*, 482 U.S. 78, 89 (1987), under which a prison regulation that impinges on prisoners' constitutional rights is valid if "reasonably related to legitimate penological interests." In applying the *Turner* standard to a First Amendment retaliation claim, we examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests. *See Bridges*, 557 F.3d at 551 (concluding that the prisoner's speech was not inconsistent with legitimate penological interests). Here, Watkins bases his retaliation claim on two distinct acts of speech—his February 13 criticism of Kasper's library policies and his February 26 oral complaint about the placement of his personal materials in the library—and we consider each in turn.

Beginning with Watkins's February 13 speech, before we apply the legitimate penological interests test, we must address whether Watkins had the additional burden of proving that this speech satisfied the "public concern" test. Developed by the Supreme Court in the public employment context, this test provides that a public employee's speech must relate to a matter of "public concern," rather than mere "personal interest," in order to support a First Amendment retaliation claim. *Connick v. Myers*, 461 U.S. 138, 147 (1983). As explained in *Connick*, this public concern requirement promotes efficient government operations by respecting public employers' authority to manage their offices and discipline their employees. If a public employee expresses a personal complaint about workplace policy not involving a matter of public concern, the employer should have "wide latitude" in responding, "without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146. Otherwise, every employment decision could become a "constitutional matter," and "government offices could not function." *Id.* at 147.

The Court extended the public concern requirement in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), holding that disciplinary actions taken in response to statements made as part of a public employee's "official duties," rather than "as a citizen," are not actionable retaliation, even if that speech relates to a matter of public concern. As in *Connick*, the Court emphasized the significant control that government employers, no less than private employers, must have over their employees' speech in order to operate efficiently. *Id.* at 418.

In *Bridges*, we generally disavowed the public concern test in prisoner free speech cases, reasoning that the vast differences between the government's relationships with public employees and with prisoners made the test unworkable in the prison context. *See* 557 F.3d at 550-51. But we left open the possibility that a prisoner's speech made as an employee of the prison might be subject to a public concern limitation, suggesting that the rationales underlying the *Connick-Garcetti* case line are transferable to such prisoner-employee speech. *Id.* at 552 n.3. Since Watkins spoke as a prisoner-employee when he criticized Kasper's library policies during the February 13 meeting, we must now resolve the public concern/prisoner-employee question left open by *Bridges.*

Upon further consideration, we think that it's time to completely jettison the public concern test from our prisoner free speech jurisprudence, even in the case of speech by a prisoner-employee. In our view, the dynamics of the government's relationships with prisoner-employees and with public employees are too dissimilar to transfer the public concern test to the prison context.

In the public employment cases, the Supreme Court has drawn a fine line between the speaker's role as a citizen and as a public employee. *See Garcetti*, 547 U.S. at 418-19. A citizen who wants the benefits of a government job may be expected to accept certain restrictions on speech made as a public employee, *id.* at 418, restrictions that the public employer would have no authority to impose but for the employment relationship. As the Court has emphasized, giving public employers this discretion to

limit their employees' internal workplace complaints is essential for efficient government operations. *See id.* at 422-23. Outside of the public employee's job, however, these operational concerns fade, and the employee may go back to living and speaking as an ordinary citizen. In essence, the public employee's relationship with the government employer, and the corresponding restraint on the employee's speech, is limited to the job itself.

In the prison setting, the prisoner's job is only one part of a much broader, comprehensive penological program in which prison officials control all aspects of the prisoner's life. *See Bridges*, 557 F.3d at 552 n.3. And at least with respect to the MCF's program, the job is an essential and wholly integrated part. Watkins was not one of a privileged few prisoners who managed to land a prison job. As Watkins explained during his trial testimony, with few exceptions, "everybody works" at MCF, providing a wide variety of prison services such as library, cafeteria, and recreation. So unlike the typical civil servant who enjoys a life outside of work, the MCF prisoner cannot so neatly separate his public employment from his after-hours life as an inmate. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (en banc) (noting the dissimilarities between the government's relationships with a prisoner and with a public employee).

This observation—that the prisoner's job is only a small aspect of a larger penological program—relates to a second reason why the public concern test is unworkable in the prison employment context. Any marginal discretion that the public concern test might give prison

officials in controlling prisoner-employees is eclipsed by the substantial discretion that they already have in controlling the entire prison population. Prison officials are not as constrained as other government employers, who without the *Connick-Garcetti* case line would have little authority to limit their citizen-employees' free speech. Under *Turner*, prison officials have broad discretion to regulate prisoners' speech when consistent with "legitimate penological interests." *Turner*, 482 U.S. at 89. Given their broad background authority under *Turner*, prison officials don't need the benefit of the public concern requirement, and attempting to graft this requirement onto prisoner-employees' free speech claims would needlessly complicate the legitimate penological interests test.

In sum, then, we hold that the public concern test developed in the public employment context has no application to prisoners' First Amendment claims, even in the case of speech by a prisoner-employee. It follows that Watkins did not have to prove that his February 13 speech criticizing Kasper's library policies, though made while an employee of the library, related to a matter of public concern. What he did have to prove is that he engaged in this speech in a manner consistent with legitimate penological interests.

In evaluating Watkins's speech under the legitimate penological interests test, our starting point is *Turner*, in which the Supreme Court examined a prison regulation limiting inmate-to-inmate correspondence. *See* 482 U.S. at 91-93. The Court discussed several relevant factors:

whether a "valid, rational connection" exists between the regulation and the legitimate interest put forth to justify it; whether "alternative means of exercising the right . . . remain open to prison inmates"; "the impact accommodation of the asserted constitutional right" will have on prison officials and inmates; and the availability of "obvious, easy alternatives" to the challenged regulation. 482 U.S. at 89-90 (citations omitted).

Although *Turner* dealt with a direct challenge to a prison regulation rather than a retaliation claim like Watkins's, *see Bridges*, 557 F.3d at 549, several *Turner* factors are relevant to the question of whether Watkins's February 13 speech is an activity protected by the First Amendment. As for the "the impact" of accommodating this speech, Watkins's criticism of Kasper's policies during the February 13 library meeting had a negative impact on Kasper's legitimate interests in discipline and providing efficient library services. By openly challenging Kasper's directives in front of other prisoner law clerks, Watkins impeded her authority and her ability to implement library policy. *Cf. Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008) (Insubordinate remarks that are "inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system" are not protected. (quotation omitted)). What's more, Watkins's criticism related to not only his own job interests but also the interests of other inmates, as he objected to Kasper's restriction on clerks' providing legal assistance. This advocacy on behalf of his fellow inmates made Watkins's complaints particularly disruptive to Kasper's legitimate policy interests. *See Shaw v. Murphy*,

532 U.S. 223, 231 (2001) (observing that the advocacy of inmate law clerks, though important in many contexts, often undermines prison discipline).

Regarding the availability of "alternative means" for Watkins to express his complaints, this *Turner* factor further illustrates that Watkins's February 13 speech was inconsistent with legitimate penological interests. Although Watkins has a general First Amendment right to criticize Kasper's library policies, he must do so "in a *manner* consistent with his status as a prisoner." *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 864 (5th Cir. 2004). Instead of openly criticizing Kasper's directives during a meeting with other law clerks, Watkins could have taken the less disruptive approach of filing a written complaint. *See Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989) (concluding that written complaints about the treatment of a prisoner's property and work assignments "may not adversely affect the discipline of the prison"). Because Watkins's public challenge to Kasper's directives was inconsistent with her legitimate interests in discipline and library administration, this speech is unprotected as a matter of law under *Turner*.

We acknowledge that not all of Kasper's alleged responses to Watkins's February 13 speech were rationally related to the legitimate penological interests that we have identified. At trial, Watkins argued that Kasper did not merely fire him for criticizing her library policies and replace him with a more compliant law clerk. Instead, she took a host of disciplinary actions unrelated to Watkins's job as a law clerk, including dis-

posing of his personal legal materials and denying him access to the law library. Admittedly, these acts of destroying Watkins's property and restricting his library access would not advance Kasper's legitimate interests in discipline and efficient library services. Even so, the particular nature of the adverse actions cited by Watkins does not affect our analysis of his retaliation claim, which goes to the threshold question of whether his February 13 speech was an "activity protected by the First Amendment." *Bridges*, 557 F.3d at 546. Since we conclude that this speech is not protected under the legitimate penological interests test, it cannot support Watkins's First Amendment retaliation claim.

That is not to suggest that prison officials may punish prisoners with impunity for their complaints about prison policy, merely because those complaints are exercised in a manner inconsistent with legitimate penological interests. Importantly, a prisoner who suffers the type of arbitrary discipline alleged by Watkins has remedies other than a First Amendment retaliation claim. To the extent that Watkins relies on the destruction of his personal legal materials, his complaint is better characterized as a deprivation of property claim, for which he may seek relief at state law. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (holding that an intentional deprivation of a prisoner's property does not violate the Due Process Clause if adequate state post-deprivation remedies are available); *Wynn v. Southward*, 251 F.3d 588, 592-93 (7th Cir. 2001) (per curiam) (noting that the Indiana Tort Claims Act is an adequate post-deprivation remedy for the loss of a prisoner's personal property). As for

Watkins's claim that Kasper retaliated against him by restricting his access to the law library, this complaint goes more to Watkins's right of access to the courts than his free speech rights. *See Lewis v. Casey*, 518 U.S. 343, 350-51 (1996) (examining the importance of an adequate law library to prisoners' right of access to the courts); *Marshall v. Knight*, 445 F.3d 965, 968-69 (7th Cir. 2006) (recognizing a prisoner's access-to-courts claim based on diminished access to the prison law library). Watkins cannot use these property and access-to-courts harms to salvage a First Amendment retaliation claim from his February 13 speech, which we conclude is inconsistent with Kasper's legitimate penological interests.

We turn to the second act of speech on which Watkins bases his First Amendment retaliation claim—his February 26 oral complaint to Kasper about the placement of his legal materials in the library. A prisoner has a First Amendment right to make grievances about conditions of confinement, including the mistreatment of his personal property. *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005) (addressing a prisoner's grievance about a guard's tampering with his typewriter). Still, under the legitimate penological interests test, the prisoner must exercise that right "in a *manner* consistent with his status as a prisoner." *Freeman*, 369 F.3d at 864.

We conclude that the confrontational, disorderly manner in which Watkins complained about the treatment of his personal property removed this grievance from First Amendment protection. Watkins did not confine himself to a formal, written grievance or a courte-

ous, oral conversation with Kasper about the placement of his legal materials. Instead, he confronted Kasper face-to-face in the library, presumably within earshot of other prisoners, using a loud voice and active hand gestures, prompting Kasper to file a conduct report for intimidation. *See id.* (observing that the prisoner went beyond internal grievance procedures to a "public rebuke" of a prison official). The confrontational approach that Watkins used to make his grievance was inconsistent with the legitimate penological interest of prison discipline and order. *See Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir. 2009) (recognizing that a grievance presented in a way that posed "a substantial threat to security and discipline" would be unprotected); *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (finding that a pamphlet urging inmates to engage in work stoppages was inconsistent with legitimate penological interests); *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (characterizing a prisoner's foul comment to a prison official that was "insulting, derogatory, and questioned her authority" as unprotected speech); *Freeman*, 369 F.3d at 864 (concluding that a public rebuke of a prison chaplain that incited some fifty prisoners to walk out of a church service was inconsistent with prison discipline).

It is also important that the MCF's prison disciplinary board found, and Watkins doesn't dispute, that Watkins committed the offense of disorderly conduct by confronting Kasper in such a disruptive manner. Watkins cannot rely on an act of speech that he concedes violated legitimate prison rules as the basis for his free speech retaliation claim. *See Smith*, 532 F.3d at 1277 (concluding

that speech found to be false and insubordinate under a valid prison regulation was unprotected); *Thaddeus-X*, 175 F.3d at 395 ("[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one" of a First Amendment retaliation claim.).

Both acts of speech on which Watkins bases his First Amendment retaliation claim are inconsistent with legitimate penological interests. These speech acts are unprotected as a matter of law and cannot support the jury's verdict in favor of Watkins. We REVERSE and REMAND with instructions to enter judgment in favor of Kasper.