NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 22, 2013[*]
Decided May 23, 2013

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-3551

| | |
|---|---|
| STANLEY L. FELTON, also known as GESA KALAFI-FELTON, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 11-cv-480-slc |
| PETER HUIBREGTSE, et al., *Defendants-Appellees.* | Stephen L. Crocker, *Magistrate Judge.* |

**O R D E R**

Stanley Felton, a Wisconsin prisoner, sued five prison employees under 42 U.S.C. § 1983, arguing that they retaliated against him, in violation of the First Amendment, for

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

complaining in a letter mailed to the deputy warden, Gary Boughton, that Boughton had ignored his earlier grievances. The district court granted summary judgment to all five defendants after concluding that Felton's letter was disrespectful and therefore not protected speech. We conclude that a complaint mailed outside of the normal grievance process containing offensive language that is unnecessary to the complaint itself is not protected speech. Therefore, we affirm the judgment.

The facts are undisputed. Felton filed a formal complaint in January 2010 asking for the return of a book and other materials that he was using to learn Swahili, property that he said had been confiscated during a search of his cell. That complaint (No. 2010-1030) was rejected as moot on the basis that "[a]ll items that were taken from Inmate Felton have been returned to him." Felton appealed, asserting that he had received the book back but not the other materials, namely 94 pages written in Swahili by two other prisoners. Boughton denied the appeal, stating tersely that the complaint had been "appropriately rejected." *See* WIS. ADMIN. CODE DOC § 310.11(5). Felton then filed a new complaint (No. 2010-2444) seeking return of the Swahili papers. That complaint was denied because the issue had supposedly been addressed in his earlier complaint. Felton appealed again, and Boughton again denied the appeal, concluding simply that it had been "appropriately rejected."

After receiving this second rejection letter, Felton wrote and mailed the following letter to Boughton outside the formal complaint process, criticizing Boughton:

Deputy Warden Boughton:

Received your decision today 2/10/2010, on complaint 2010-2444. You ruled the ICE [inmate complaint examiner] appropriately rejected complainant complaint for being previously address[ed]. This clearly shows you did know [no] investigation, whatsoever. The complaint the ICE staff (Kelly Trumm) is referring to is #2010-1030 which was "moot" because the "Swahili Book" was returned. This had nothing to do with the 94 pages of material taken by Capt. Brown, which he still has. This "computerized signature" on this decision is a sham just like the ICE process is. I'll bet you never even seen or read my complaint because any idiot could see the issue has never been address[ed], because Capt. L. Brown still has my material, so, how has the issue been address[ed], please inform me.

Believing that the letter was disrespectful, Boughton showed it to Felton's Unit Supervisor, Brian Kool. Two days later, Felton was transferred to a different unit and removed from the "High Risk Offender Program." This voluntary program allows inmates on administrative confinement status, such as Felton, to return to the general population after meeting certain behavioral goals by showing respect for authority and the ability to resolve disputes

peacefully. Program participants receive the benefits of more yard time, more calls per week, fewer restraints, and more chances to interact with other prisoners.

Contending that the defendants retaliated against him for complaining about the review process, Felton sued Warden Huibregtse and the four prison employees who removed him from the program—Boughton, Kool, David Gardner (a guard), and Melanie Harper (a social worker). To support his claim that his letter prompted retaliation, Felton furnished evidence comparing how the prison has treated other inmates: Prisoners guilty of major prison offenses (such as fighting and group resistance) are disciplined with time in segregation, but they have been allowed to stay in the program. By contrast, Felton received only a warning for the letter, and—as the defendants concede—inmates are not disciplined for warnings, *see* WIS. ADMIN. CODE DOC § 303.65, yet the defendants removed him from the program. Felton also asserted that, by removing him from the program—and thereby withdrawing its significant perks—the prison has deterred prisoner speech.

The defendants concede that the letter led them to remove Felton from the program but deny that the speech was protected. They identify three sentences of the letter that they consider disrespectful and unprotected:

> This clearly shows <u>you</u> did know [no] investigation, whatsoever. . . . This "computerized signature" on this decision is a sham just like the ICE process is. I'll bet you <u>never</u> even seen or read my complaint because any idiot could see the issue has never been address[ed] . . .

Boughton, Kool, Gardner, and Harper emphasize that they removed Felton from the program because of these "disrespectful comments" in the letter, and not simply because Felton sent a letter directly to Boughton requesting the return of his Swahili papers.

The magistrate judge, presiding by consent, granted summary judgment to the defendants. First, he ruled that Huibregtse was not liable because he was not personally involved in the decision. Second, he decided that the other defendants were not liable because "framing a comparison between Boughton and an idiot was disrespectful" and thus concluded that the letter was not protected speech.

On appeal, Felton argues that the district judge erred by misinterpreting the phrase "any idiot" in his letter. He contends that the plain reading of the phrase "I'll bet you *never* even seen or read my complaint because any idiot could see the issue has never been address[ed]" reveals that his complaint was that Boughton rubber-stamped the rejections without any review. Felton argues that he was simply illustrating why he believed that Boughton had never actually read his formal grievances and draws this logical progression: "any idiot" who read the complaints would see that they were different, Boughton did not

notice the difference, Boughton is smarter than an idiot, and therefore Boughton did not read the complaints.

To establish a claim of retaliation, Felton must show that he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there was a causal connection between the two. *See Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The defendants acknowledge that Felton's letter caused them to remove him from the program, and they do not contest that removal carries a loss of privileges that might reasonably deter similar speech. So the only question that remains is whether the letter mailed to Boughton was protected speech.

Inmates face a number of restrictions on their speech. *See generally Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001); *Turner v. Safley*, 482 U.S. 78, 89–90 (1987). Two are relevant to this case. First, if justified by legitimate penological concerns, prisoners can be limited in *how* they make their complaints. *Compare Watkins v. Kasper*, 599 F.3d 791, 797-98 (7th Cir. 2010) (concluding that inmate's oral complaint was unprotected speech because complaint openly challenged librarian's policies in front of inmate clerks, thus threatening disruption, and written grievance process was adequate alternative form of speech) *with Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (explaining that oral complaint about prison conditions was not unprotected merely because it was not formalized in written grievance).

Second, we have recognized that the need for obedience in prisons justifies reasonable limitations on disrespectful language. *See Van den Bosch v. Raemisch*, 658 F.3d 778, 788 (7th Cir. 2011) (explaining that prison officials reasonably denied inmate access to newsletter that "contain[ed] misleading information, encourage[d] distrust of prison staff, and could potentially undermine the prison's rehabilitative initiatives"); *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986) (ruling that inmate's letter to warden calling guards "stupid lazy assholes" and inviting them to "bring their fat asses around the gallery at night" was unprotected); *see also Smith v. Mosley*, 532 F.3d 1270, 1272 (11th Cir. 2008) (explaining that prison officials reasonably punished inmate for insolent comments, including inmate's assertion in letter to warden that "To be forced outside in weather conditions that we are being subject to amounts to pre-meditated assault because any person of reasonable intelligence knows the likely consequences of our being subjected to such non-sense."); *Lockett v. Suardini*, 526 F.3d 866, 869, 874 (6th Cir. 2008) (concluding that inmate's reference to hearing officer as "foul and corrupted bitch" was not protected).

Reflecting a prison's prerogative to prohibit disrespectful language while protecting the status of formal grievances, Wisconsin prison regulations allow inmates more leeway when complaining *within* the formal grievance process than outside it. *Compare* WIS. ADMIN. CODE DOC § 303.25 ("disrespect . . . includes, but is not limited to, derogatory or profane

writing, remarks or gestures, name-calling, yelling, and other acts made outside the formal complaint process which are expressions of disrespect for authority.") *with* WIS. ADMIN. CODE DOC § 310.09(c) (formal complaints cannot be "obscene, profane, abusive, or threaten[] others").

Applying these principles, we conclude that, by mailing Boughton a letter comparing him to "any idiot," Felton's conduct was unprotected and the defendants could rely on it to remove him from a program that insists on respect. Even if in crafting that comparison Felton intended no disrespect, as he insists is the case, the defendants could reasonably conclude that the passage disparaged the deputy warden, that it did so gratuitously, and that, if left unanswered, the letter could inspire other inmates to use means outside of formal grievances to undermine respect for prison authority. *See Watkins*, 599 F.3d at 797–98 (noting that prison administrator could reasonably fear that prisoners might become disruptive in response to inmate's open challenge to administrator's disciplinary authority); *Van den Bosch v. Raemisch*, 658 F.3d at 788 ("prisons maintain broad discretion in prohibiting material in prison that potentially endangers institutional security"). Accordingly, the letter contained unprotected speech, and the defendants could therefore remove Felton from the program because of it without violating the First Amendment. *See Watkins*, 599 F.3d at 794–95; *Bridges*, 557 F.3d at 546. (The sentence containing the "idiot" comparison was unprotected, so we need not decide whether the other two sentences that the defendants cite were also unprotected.)

We recognize that Felton sent the letter to Boughton because, after twice attempting to resolve the issue of his unreturned Swahili papers with formal grievances, he was frustrated with Boughton for, in his view, rejecting his complaints without reading them. But instead of sending a personal letter to Boughton with an insulting charge that was not necessary to advance his contention that his papers should be returned, Felton had other, protected alternatives to secure relief. *See Turner v. Safley*, 482 U.S. at 90. He could have notified the Wisconsin Attorney General within 120 days of the seizure of his papers that his claim against state employees for the missing property remained unresolved, *see* WIS. STAT. § 893.82(3), allowing the Attorney General to investigate and potentially resolve the claim, *see id.* § 893.82(1)(b). If still dissatisfied after that, then as we suggested in *Watkins,* 599 F.3d at 798, he has legal remedies for lost property that he may pursue in state court. *See generally Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Gable v. City of Chicago*, 296 F.3d 531, 539–40 (7th Cir. 2002).

                                                                                        AFFIRMED.