NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 180760-U

NO. 4-18-0760

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 5, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JEFFERSON COLEMAN and WILLIE HARRIS, | ) | Appeal from the |
|     Plaintiffs-Appellants, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| KEVIN McDERMOTT, as Special Representative for | ) | No. 05MR512 |
| Decedents ROGER E. WALKER JR. and DOUGLAS | ) | |
| CRAVENS, MELODY FORD, DIANN MARSALEK, | ) | |
| JACKIE MILLER, BRIAN FAIRCHILD, WILBER | ) | |
| PURSELL, WILLIAM PICKERING, GREGORY | ) | |
| SCHWARTZ, JULIUS FLAGG, JOHN EVANS, | ) | |
| DAVID TRACY, ROBERT DAVENPORT, CAROL | ) | |
| McBRIDE, KENT DEEN, TIMOTHY LAIRD, CHAD | ) | |
| SPILLER, DONNA HEIDEMANN, SUSAN BERNER, | ) | |
| COLLEEN RENNISON, JAMES MAHLANDT, and | ) | Honorable |
| ROBERT GULLEY, | ) | Rudolph M. Braud Jr., |
|     Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1  *Held*: The circuit court committed no error in dismissing inmates' *pro se* complaint for failure to state a cause of action under section 1983 of the federal Civil Rights Act (42 U.S.C. § 1983 (1996)).

¶ 2  In December 2015, plaintiffs, Jefferson Coleman and Willie Harris, then both inmates in the Illinois Department of Corrections (DOC), filed a *pro se* third amended complaint under section 1983 of the federal Civil Rights Act (42 U.S.C. § 1983 (1996)) against defendants—Kevin McDermott, as special representative for decedents Roger E. Walker Jr. and Douglas

Cravens; Melody Ford; Diann Marsalek; Jackie Miller; Brian Fairchild; Wilber Pursell; William Pickering; Gregory Schwartz; Julius Flagg; John Evans; David Tracy; Robert Davenport; Carol McBride; Kent Deen; Timothy Laird; Chad Spiller; Donna Heidemann; Susan Berner; Colleen Rennison; James Mahlandt; and Robert Gulley—alleging defendants were DOC employees who acted to suppress their first amendment rights to free speech. In September 2016, defendants filed a combined motion to dismiss plaintiffs' third amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)). The circuit court granted defendants' motion, dismissing plaintiffs' third amended complaint with prejudice, and plaintiffs appealed.

¶ 3        On appeal, only Harris has filed an appellant's brief. He argues the circuit court erred by granting defendants' motion to dismiss. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In October 2005, Harris, Coleman, and two other DOC inmates filed the original *pro se* complaint in this matter against defendants. In December 2015, only Harris and Coleman filed the *pro se*, 26-count third amended complaint that is at issue on appeal.

¶ 6        In their third amended complaint, plaintiffs alleged they were imprisoned in DOC's Pinckneyville Correctional Center (Pinckneyville) and suing defendant DOC employees in their individual capacities under section 1983 of the federal Civil Rights Act for alleged acts impacting upon their ability to provide legal assistance to other inmates and which they maintained arbitrarily suppressed their speech. Plaintiffs asserted the various defendants (1) engaged in a civil conspiracy to suppress their speech (count I); (2) engaged in a "Civil Conspiracy to Retaliate" against them with the objective of suppressing their speech by removing them from assignments, initiating

- 2 -

arbitrary disciplinary proceedings, imposing arbitrary disciplinary sanctions, and concealing and failing to remedy DOC staff misconduct (counts II through XXII); and (3) failed to intervene in or remedy the imposition of arbitrary disciplinary sanctions (counts XXIII through XXVI).

¶ 7　　　　Specifically, in count I of their complaint, alleging "Civil Conspiracy to Suppress *** Speech," plaintiffs asserted that DOC's rules authorized "prisoner to prisoner legal assistance." However, on July 18, 2003, defendant Marsalek—whom plaintiffs identified as DOC's "Chief Legal Counsel"—"authored, or caused to be created," a memo stating "library staff and inmate law clerks" at Pinckneyville "should not be giving legal advice, including deadlines [for] filing cases or pleadings." Plaintiffs asserted Marsalek's memo advocated "a *de facto* policy contrary to applicable state and federal laws."

¶ 8　　　　Plaintiffs maintained that after receiving Marsalek's July 2003 memo, DOC employees Evans, Schwartz, and Flagg (Pinckneyville's warden and assistant wardens); Berner, Heidemann, and Rennison (Pinckneyville employees who were also employed by "School District 428"); and Tracy (Pinckneyville's "Public Service Administrator Attorney")—"convened multiple unrecorded meetings to implement" the policy outlined in the memo. They asserted the named defendants took such action despite knowing "it to conflict with applicable state and federal law," and the rules and regulations of both DOC and School District 428. Plaintiffs alleged the meetings resulted in "an agreement" and actions to implement the policy at Pinckneyville, and Rennison informed Pinckneyville "law and library clerks" of both "the new restrictions" and Evans's "threat of disciplinary action" for violating "the new policy."

¶ 9　　　　In counts II through XXII, alleging "Civil Conspiracy to Retaliate," plaintiffs asserted various defendants acted to retaliate against them and suppress their speech by

- 3 -

orchestrating their removal from housing and work assignments, misleading them regarding DOC rules, arbitrarily charging them with DOC rule violations, imposing disciplinary sanctions against them, and failing to investigate or remedy their inmate grievance claims of staff misconduct. In connection with their retaliation claim, plaintiffs alleged the following facts.

¶ 10      On or before July 23, 2004, Evans received a complaint written by inmate Stanley Wofford, quoting an "Institutional Directive" and alleging defendant Pickering (a correctional officer) engaged in an intentional tort. Plaintiffs maintained Wofford was investigated and interrogated by defendant Laird (also a correctional officer) for the purpose of discovering whether he possessed a copy of the "Institutional Directive" and "from whom he obtained it." Wofford admitted that he possessed the document and reported he "got it from someone in the law library." According to plaintiffs, Laird communicated Wofford's statements to Evans, who ordered a "shakedown of the inmate law library and inmates in attendance, for the purpose of confiscating [Institutional Directives] and prevent[ing] dissemination of them among prisoners."

¶ 11      Plaintiffs alleged that, during the law library shakedown on July 23, 2004, inmates in the library were told to gather their belongings and prepare to exit the library. Defendant Spiller (correctional officer) stated that inmates could not take legal documents belonging to other prisoners unless they were "law and library clerks." Plaintiffs asserted that upon leaving the library, Harris was found in possession of another inmate's legal documents but, as a law and library clerk, was allowed to retain the documents and return to his housing unit.

¶ 12      On July 29, 2004, defendant Mahlandt (a correctional officer) stopped Coleman before he entered the law library and searched and confiscated his legal folder. Shortly thereafter, Coleman was handcuffed. Plaintiffs asserted Mahlandt confiscated documents Coleman had

prepared for other prisoners and then authored an inmate disciplinary report (IDR) that "falsely" charged Coleman with violating DOC "Rule 308 Contraband/Unauthorized Property." According to plaintiffs, defendant Gulley (a correctional officer) searched Coleman's cell and prepared an IDR "falsely" charging him with "violating Department Rule 308."

¶ 13 Plaintiffs further alleged that on July 29, 2004, correctional officers, including Pickering, "forcibly removed [Harris] from his work assignment" in the inmate law library and took him to "disciplinary segregation." On August 30, 2004, defendant Laird issued an IDR charging Harris with "violating Department Rules 504.211 and 308 on July 29, 2004." Plaintiffs asserted the August 30, 2004, IDR was "untimely" and false because Harris was "cited for rule violations of items Pinckneyville officials permitted him to possess following his transfer from [another prison.]"

¶ 14 On September 24, 2004, Laird authored and issued an IDR charging Coleman with "violating Department Rules 504.211 and 308 on July 29, 2004." Plaintiffs alleged the September 24, 2004, IDR was untimely and false because Coleman was "cited for conduct consistent with his work assignment and authorized law."

¶ 15 On August 4, 2004, defendants Davenport and McBride (Institutional Adjustment Committee (IAC) members) convened a disciplinary hearing on three IDRs issued to Coleman on or after July 29, 2004. Plaintiffs asserted Davenport signed a final summary report for each IDR, finding Coleman guilty, and alleged Coleman was subject to disciplinary sanctions in connection with at least two of the IDRs. They maintained McBride did not sign the final summary reports and the hearing violated department rules because "none of the alleged contraband" that was confiscated was presented at the hearing.

¶ 16 Plaintiffs further alleged that DOC rules required the IAC to be composed of at least two members. The rules also permitted Evans to review and approve IAC decisions. On August 12, 2004, Evans received the IAC final summary reports signed by Davenport. According to plaintiffs, Evans reviewed and approved the final summary reports, but his actions were contrary to DOC rules because those reports had not also been signed by McBride. They alleged McBride signed the final summary reports on August 16, 2004, after they were already approved by Evans "contrary to the principal of fundamental fairness" and DOC rules. According to plaintiffs, McBride "acted to conceal the invalidity of" Evans's conduct and to validate the final summary reports.

¶ 17 On September 7, 2004, Davenport and McBride conducted a disciplinary hearing in connection with an IDR issued to Harris for "violating Department Rules 211 (Possession or Solicitation or Unauthorized Personal Information) and 308 (Contraband/Unauthorized Property)." Plaintiffs alleged "[n]o unauthorized personal information, contraband, or unauthorized property evidence" was presented at the hearing. Also, contrary to DOC rules, none of the witnesses Harris requested were interviewed or had their statements taken, Harris was not informed of the existence of exonerating evidence, and Harris was not permitted to provide a written statement. Plaintiffs asserted that on September 25, 2004, Davenport and McBride prepared and signed a final summary report, finding Harris guilty "without properly determining his guilt." Additionally, they maintained defendants' final summary report failed to indicate any evidence received after the September 7, 2004, hearing; failed to state a reason why Harris's witness list was rejected; and did not give a basis for the IAC's decision to disregard exculpatory evidence. Plaintiffs allege that on September 25, 2004, Evans received the final summary report,

which he affirmed, despite being aware of both disciplinary hearing errors and the untimeliness of the underlying IDR.

¶ 18    On October 1, 2004, Coleman appeared before Deen and McBride (IAC members) in connection with an IDR written by Laird on September 24, 2004, charging him with "violating [DOC] Rule 504.211 and 308 on July 29, 2004." Plaintiffs alleged Coleman sought and obtained a continuance of the proceeding "to obtain his property and retrieve his written statement." However, on October 4, 2004, the IAC issued a final summary report that contained false information and "arbitrarily finding him guilty without a hearing." Plaintiffs alleged Evans approved the IAC's final summary report the same day and that he acted contrary to DOC rules because he knew the underlying IDR "should not have been employed to commence disciplinary proceedings within the meaning of [DOC] [r]ule 504.3(f)."

¶ 19    On September 2, 2004, Coleman submitted an inmate grievance, raising a claim that the IAC "impos[ed] disciplinary sanctions against him in retaliation." On September 7, 2004, defendant Pursell (an inmate grievance officer) received Coleman's grievance. Plaintiffs alleged Pursell rendered the grievance process unavailable to Coleman by declaring that the issues Coleman raised were being investigated "when, in fact, those issues were not being investigated."

¶ 20    On September 13, 2004, Evans received the grievance officer's report, which he affirmed. According to plaintiffs, Evans was aware of Coleman's "staff misconduct" claims and knew there were no pending investigations into issues of staff misconduct. They alleged Evans knew the denial of Coleman's grievance on the "pretext" that his claims were being investigated was false and "served only to deny [Coleman] access to the inmate grievance process."

¶ 21    On October 14, 2004, Coleman submitted another inmate grievance alleging his

September 24, 2004, IDR was untimely and should be dismissed and expunged from his record. According to plaintiffs, Pursell failed to address those claims, "den[ying] him access to the inmate grievance process." They further alleged that Evans concurred with the dismissal of Coleman's grievance without conducting an independent review of Coleman's allegations and despite knowing the underlying IDR was untimely and should not have been issued.

¶ 22 On October 28, 2004, Harris submitted an inmate grievance, complaining that he was denied various procedural safeguards in connection with his September 7, 2004, disciplinary hearing before the IAC. Plaintiffs alleged on December 13, 2004, Pursell received and reviewed Harris's grievance and prepared a report, finding the IAC followed procedural guidelines. They asserted Pursell called no witnesses and referenced no DOC rules in connection with his decision, resulting in no meaningful review of Harris's claims and effectively denying him access to the grievance process. On December 21, 2004, Evans received Pursell's report and concurred with his recommendation to terminate Harris's grievance proceedings. Plaintiffs alleged Evans conducted no independent review of Harris's claims, depriving Harris of his rights.

¶ 23 Finally, in counts XXIII through XXVI, alleging "Failure to Intervene or Remedy the Imposition of Arbitrary Disciplinary Sanctions," plaintiffs asserted defendants Fairchild, Ford, and Cravens (members of DOC's Administrative Review Board) and defendant Walker (DOC's Director) "turned a blind-eye" to the deprivation of plaintiffs' constitutionally protected rights. Specifically, they alleged Coleman appealed the denial of his grievances. On October 7, 2004, he mailed a grievance appeal, which was received on October 14, 2004, by Fairchild. Plaintiffs asserted Coleman's grievance appeal was "timely filed" but, on November 12, 2004, Fairchild rejected Coleman's grievance appeal on the basis that it was untimely. Plaintiffs asserted

Fairchild's rejection was a "pretext" and denied Coleman "the appellate process."

¶ 24 On November 17, 2004, a second grievance appeal by Coleman was received by Ford. Plaintiffs alleged Ford conducted a biased review of the grievance appeal "by limiting her examination of Coleman's claims to documents she'd obtained from the defendant officials at Pinckneyville." They asserted on March 22, 2005, Ford arbitrarily denied Coleman's appeal.

¶ 25 Plaintiffs alleged Harris also submitted a grievance appeal that Cravens received on January 13, 2005, and denied on March 29, 2005. Plaintiffs assert Cravens denied Harris a "meaningful hearing on his issues" by deciding to forgo a formal hearing and conducting "a biased review" of Harris's appeal. They maintained Cravens neglected to consider or inquire into the substance of Harris's claims and the denial of his appeal was arbitrary.

¶ 26 Finally, plaintiffs alleged Walker knew or should have known that there was a "*de facto* policy to suppress prisoner[s'] speech, advocated and circulated throughout DOC by" Marsalek and that such a policy conflicted with applicable constitutional and administrative laws. They asserted Walker failed to take reasonable steps to prevent the arbitrary implementation of the policy or the resulting violations of prisoner rights. Plaintiffs also asserted Walker received their individual grievance appeals but conducted no investigations and did nothing to protect plaintiffs' rights or remedy the violation of their rights. Instead, Walker concurred with the findings of the Administrative Review Board, denying plaintiffs' administrative relief.

¶ 27 In September 2016, all defendants except Marsalek filed a combined motion to dismiss plaintiffs' third amended complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2014)). They alleged they were entitled to dismissal of plaintiffs' complaint under section 2-615 of the Code (*id.* § 2-615) because plaintiffs "failed to allege sufficient facts to

support any claim upon which relief [could] be granted." Defendants also asserted plaintiffs' complaint should be dismissed with prejudice under section 2-619 of the Code (*id.* § 2-619) "for a variety of reasons," including that inmates have no constitutional right to provide legal assistance to other inmates.

¶ 28    In October 2017, the circuit court entered an order granting defendants' motion and dismissing plaintiffs' third amended complaint. In so holding, the court made the following findings:

"1. Plaintiffs cannot base their First Amendment claims on protected conduct engaged in by another inmate.

2. Plaintiffs have no First Amendment right to assist other inmates in legal work, to provide Institutional Directives to other inmates, or to possess other inmates' legal documents.

3. The rules and regulations governing [DOC] do not create more substantive rights for prisoners than those created by the United States Constitution.

4. A prison official can only be liable for Failure to Intervene in an underlying constitutional violation if that official is present during the underlying violation, and therefore could have stepped in to prevent the violation as it was happening.

5. Plaintiffs have not alleged facts sufficient to plead a cause of action ***.

6. Plaintiffs have not alleged facts sufficient to show that any conspiracy existed between or among the Defendants, or any other persons."

The court further ordered that plaintiffs' complaint was dismissed with prejudice. Noting the protracted nature of the case and that there had been "substantial defects in the prior pleadings,"

- 10 -

the court determined that the defects in the third amended complaint could not be cured by any further amendment.

¶ 29　　　　　Ultimately, plaintiffs moved for reconsideration of the circuit court's October 2017 ruling. In June 2018, the court conducted a hearing on the motion. Coleman failed to appear at the hearing, and the court denied his request for relief "for failure to appear and diligently prosecute the case." In October 2018, the court conducted a further hearing on the matter and denied the motion.

¶ 30　　　　　This *pro se* appeal followed. The record reflects a *pro se* notice of appeal was filed on November 8, 2018, which named, and was signed by, both plaintiffs. Plaintiffs appealed the circuit court's October 2018 denial of their motion to reconsider, its June 2018 denial of Coleman's request for relief based on his failure to appear, and its October 2017 dismissal of the third amended complaint.

¶ 31　　　　　　　　　　　　　　　II. ANALYSIS

¶ 32　　　　　As stated, on appeal, only Harris—and not Coleman—has filed an appellant's brief. We note "it is permissible for a reviewing court in the exercise of its inherent authority to dismiss an appeal for the appellant's failure to file its brief within the time prescribed by rules of [the supreme] court." *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131, 345 N.E.2d 493, 494 (1976). Here, dismissal is unwarranted given Harris's continued and timely pursuit of the appeal. However, given Coleman's failure to file an appellant's brief, we address the issues on appeal only as they pertain to Harris and not Coleman.

¶ 33　　　　　In challenging the circuit court's dismissal of the third amended complaint, Harris argues (1) civil conspiracy is a cognizable claim against state actors under section 1983, (2) he

- 11 -

pleaded sufficient facts to state a cause of action for civil conspiracy, (3) he pleaded sufficient facts to state a cause of action for retaliation, (4) he pleaded sufficient facts to show defendants' adverse actions against him could deter first amendment activity in the future, (5) he had a protected liberty interest in avoiding prison disciplinary proceedings, and (6) he alleged sufficient facts of defendant Evans's "personal involvement" in the alleged constitutional deprivation to establish Evans's liability.

¶ 34　　　　　Defendants respond, arguing the circuit court's dismissal was appropriate under section 2-615 of the Code because Harris failed to allege sufficient facts to state a cause of action under section 1983. Specifically, they argue he failed to allege facts showing (1) the existence of an agreement between the various defendants, (2) defendants engaged in any acts that deprived him of his first amendment rights, (3) he was engaged in any protected first amendment activity which gave rise to the alleged retaliation, (4) defendants were motivated by retaliatory reasons, (5) the IDRs he received were arbitrary, (6) he experienced an adverse act that would likely deter an inmate from engaging in a protected first amendment activity, (7) either Cravens or Walker were personally involved in the claimed constitutional violation, and (8) he was deprived of a liberty interest as a result of prison disciplinary proceedings.

¶ 35　　　　　We agree that Harris failed to allege sufficient facts in the third amended complaint to state a cause of action under section 1983. Accordingly, for the reasons that follow, we affirm the trial court's dismissal of their third amended complaint on that basis pursuant to section 2-615 of the Code.

¶ 36　　　　　　　　　　　A. Dismissal Pursuant to Section 2-615

¶ 37　　　　　As set forth above, defendants filed a motion to dismiss pursuant to section 2-619.1

of the Code (735 ILCS 5/2-619.1 (West 2014)), permitting them to seek dismissal of plaintiffs' complaint under both section 2-615 and section 2-619 (*id.* §§ 2-615, 2-619). Relevant to this appeal, "[a] section 2-615 motion to dismiss challenges the legal sufficiency of a complaint based on defects apparent on its face." *Doe v. Coe*, 2019 IL 123521, ¶ 31, 135 N.E.3d 1. The grant or denial of such a motion is subject to *de novo* review. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429, 856 N.E.2d 1048, 1053 (2006).

¶ 38　　　　When considering the sufficiency of a complaint on review, we construe its allegations "in the light most favorable to the plaintiff" and "accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts." *Id.* "[A] cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Id.*

¶ 39　　　　Additionally, "Illinois is a fact-pleading jurisdiction." *Id.*; see also *Kucinsky v. Pfister*, 2020 IL App (3d) 170719, ¶ 55, 162 N.E.3d 426 (stating Illinois is a fact-pleading jurisdiction and "[f]act pleading imposes a heavier burden on the plaintiff, so that a complaint that would survive a motion to dismiss in a notice-pleading jurisdiction (*e.g.*, in federal court) might not do so in a fact-pleading jurisdiction"). Thus, "[w]hile the plaintiff is not required to set forth evidence in the complaint [citation], [he or she] must allege facts sufficient to bring a claim within a legally recognized cause of action [citation], not simply conclusions [citation]." *Marshall*, 222 Ill. 2d at 429-30.

¶ 40　　　　"In determining whether a cause of action has been stated, the whole complaint must be considered[.]" (Internal quotation marks omitted.) *Kucinsky*, 2020 IL App (3d) 170719, ¶ 56. Further, "*pro se* civil rights complaints are to be given a liberal construction." *Id.* Ultimately,

"[w]e may affirm an order dismissing a complaint on any basis supported by the record, regardless of the trial court's reasoning." *Id.* ¶ 34.

¶ 41                            B. Section 1983 Civil Conspiracy Claim

¶ 42         In his third amended complaint, Harris initially alleged defendants Evans, Flagg, Heidemann, Berner, Tracy, and Rennison violated his right to free speech under the first amendment by agreeing to implement policy changes that placed restrictions on an inmate "law clerk's" ability to provide legal assistance to other inmates.

¶ 43         "Section 1983 protects citizens' constitutional rights, privileges, and immunities from being infringed by state actors." *Bilski v. Walker*, 392 Ill. App. 3d 153, 157, 924 N.E.2d 1034, 1038 (2009). "[T]o establish a section 1983 cause of action, the plaintiff must show that (1) a person acting under color of state law committed the conduct complained of and (2) such conduct deprived him of rights, privileges, or immunities secured by the constitution or the laws of the United States." *Id.*

¶ 44         Additionally, "[a] civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." (Internal quotation marks omitted.) *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (2015). "To establish conspiracy liability in a [section] 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Id.*

¶ 45         However, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). "In the First Amendment context *** a prison inmate retains those First

- 14 -

Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[R]estrictions on prisoners' communications to other inmates are constitutional if the restrictions are 'reasonably related to legitimate penological interests.' " *Shaw*, 532 U.S. at 225 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). This is true even when the inmate communications involve legal assistance. *Id.* at 232. "Although supervised inmate legal assistance programs may serve valuable ends, it is 'indisputable' that inmate law clerks 'are sometimes a menace to prison discipline' and that prisoners have an 'acknowledged propensity *** to abuse both the giving and the seeking of [legal] assistance.' " *Id.* at 231 (quoting *Johnson v. Avery*, 393 U.S. 483, 488 (1969)).

¶ 46    The "legitimate penological interests test" is used to determine whether an inmate "has alleged that he engaged in protected speech." *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009); see also *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) ("[W]hether a prisoner's speech is protected is governed by the standard established in [*Turner*, 482 U.S. at 89], under which a prison regulation that impinges on prisoners' constitutional rights is valid if 'reasonably related to legitimate penological interests.' "); *Koger v. Snyder*, 252 F. Supp. 2d 723, 727 (C.D. Ill. 2003) (stating a penitentiary inmate "has no constitutional right to be a 'jail house lawyer,' and his writings related to jail house lawyering are not afforded any greater protections than other inmate-to-inmate communications"). "Legitimate penological objectives include crime deterrence, prisoner rehabilitation, and internal prison security." *Bridges*, 557 F.3d at 548 (citing *Pell*, 417 U.S. at 822-23). Additionally, factors relevant to whether a prison regulation serves a legitimate

- 15 -

penological interest include the following:

> "(1) whether there is a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted rights that remain open to prison inmates; (3) whether the accommodation of the asserted rights will have an impact on guards and other inmates and on the allocation of prison resources; (4) whether there are ready alternatives to the challenged regulation." *Holloway v. Meyer*, 311 Ill. App. 3d 818, 825, 726 N.E.2d 678, 684 (2000) (citing *Turner*, 482 U.S. at 89-91).

¶ 47　　　　Here, Harris failed to allege facts sufficient to show he was deprived of a constitutional right. As stated, in connection with his conspiracy claim, Harris alleged his first amendment right to free speech was violated because defendants agreed to implement policy changes that placed restrictions on an inmate "law clerk's" ability to provide legal assistance to other inmates. Specifically, he claimed that after DOC's chief legal counsel authored a memo reminding defendants that "inmate law clerks should not be giving legal advice," defendants implemented "a *de facto* policy contrary to applicable state and federal laws." However, not only did he fail to allege facts showing what the specific policy required, he failed to allege that defendants lacked a legitimate penological interest for any imposed restriction. Conclusory assertions that a policy was implemented "contrary to applicable state and federal laws," do not satisfy Illinois's fact-pleading requirements. Accordingly, dismissal of Harris's civil conspiracy claim was appropriate under section 2-615.

¶ 48　　　　　　　　　　C. Section 1983 Retaliation Claims

¶ 49        Next, Harris alleged various defendants retaliated against him to suppress his speech by orchestrating his arbitrary removal from his work and housing assignments, charging him with violations of DOC rules, imposing disciplinary sanctions, and concealing or failing to investigate his staff misconduct claims.

¶ 50        "To state a [section 1983] claim for retaliation under the first amendment, a plaintiff must allege that *** prison officials retaliated against him for exercising a constitutionally protected right." (Internal quotation marks omitted.) *Kucinsky*, 2020 IL App (3d) 170719, ¶ 65. "In asserting a first amendment retaliation claim, an inmate must allege that (1) he engaged in activity protected by the first amendment, (2) he experienced an adverse action that would likely deter first amendment activity in the future, and (3) the first amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." (Internal quotation marks omitted.) *Id.*

¶ 51        Here, we agree with defendants that Harris has failed to allege sufficient facts showing that he engaged in an activity protected by the first amendment, resulting in the alleged retaliatory actions. Giving the third amended complaint a liberal construction and taking it as a whole, Harris asserted he was retaliated against in various respects after another inmate, Wofford, filed a complaint against a correctional officer and reported receiving an "Institutional Directive" from "someone in the law library" whom Wofford did not name. However, Harris alleged no facts indicating he disseminated any information to another inmate, that he was the individual "in the law library" who provided the "Institutional Directive" to Wofford, or that any of the defendants believed him to be responsible for distributing any information to others.

¶ 52        Moreover, even assuming Harris alleged sufficient facts to show he provided the

"Institutional Directive" to Wofford, for the same reasons already stated, he has failed to sufficiently allege that activity was protected by the first amendment. In particular, he did not allege facts sufficient to show that distributing such material to other inmates was consistent with legitimate penological interests. See *Watkins*, 599 F.3d at 794-95 ("In applying the *Turner* standard to a First Amendment retaliation claim, we examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests."). Again, Harris has failed to allege sufficient facts to bring his claims within a legally recognized cause of action, and dismissal was appropriate under section 2-615 of the Code.

¶ 53                     D. Section 1983 Failure to Intervene Claims

¶ 54        In the third amended complaint, Harris additionally alleged that Cravens, a member of DOC's Administrative Review Board, and Walker, DOC's Director, failed to intervene in, or remedy, the retaliatory imposition of disciplinary sanctions against him and the suppression of his speech by "turn[ing] a blind-eye" and arbitrarily denying him administrative relief in connection with his grievance appeal. On appeal, defendants argue plaintiff failed to state a cause of action against Cravens or Walker because (1) he failed to allege the deprivation of a constitutional right and (2) he did not sufficiently allege Cravens and Walker were personally involved in the violation.

¶ 55        "To recover damages under section 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Kucinsky*, 2020 IL App (3d) 170719, ¶ 73 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The personal responsibility requirement of section 1983 is satisfied "if the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with [his] knowledge and consent." (Internal

quotation marks omitted.) *Gentry*, 65 F.3d at 561. The defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye ***." (Internal quotation marks omitted.) *Id.*

¶ 56       Here, Harris alleged Cravens and Walker knew of his claimed deprivation of constitutional rights through his grievance appeal but "turned a blind eye" to his situation by failing to inquire into or investigate his claims and denying him relief. Again, however, as set forth above, Harris has failed to sufficiently allege a constitutional deprivation in the first instance. We find his claims were properly dismissed pursuant to section 2-615 on that basis.

¶ 57       Additionally, as defendants point out, in the context of a section 1983 proceeding, the Seventh Circuit has held that "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007); see also *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("Prison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the Due Process Clause, and so the alleged mishandling of [inmate] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."). Here, Harris's claims against Cravens and Walker were based on their actions in denying his grievance appeal. Thus, we also find dismissal of his claims against Cravens and Walker was appropriate based on his failure to sufficiently allege that those defendants were personally involved in the claimed constitutional deprivation.

¶ 58                    E. Deprivation of Due Process Rights

¶ 59       On appeal, Harris suggests his third amended complaint also stated a claim for relief pursuant to section 1983 based upon the violation of his due process rights. He points to counts

XIII and XIV of the third amended complaint, in which he alleged "disciplinary sanctions" were arbitrarily imposed against him in violation of DOC rules. Harris argues he had "a protected liberty interest in avoiding disciplinary proceedings" that was created by, and set forth in, the language of DOC's own rules.

¶ 60    The due process clause of the fourteenth amendment "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). For prisoners, "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations[.]" *Id.* at 222. "[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest *** is not the language of regulations regarding [the conditions of confinement] but the nature of those conditions themselves ***." *Id.* at 223. Specifically, in the prison context, state created liberty interests are generally "limited to freedom from restraint which *** imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

¶ 61    Here, to establish a state-created liberty interest in avoiding certain conditions of confinement, Harris had to show that he was subjected to conditions that imposed "atypical and significant hardship" upon him "in relation to the ordinary incidents of prison life." However, in his third amended complaint he alleged only that "sanctions" were imposed against him following prison disciplinary proceedings. As defendants point out, Harris did not specify what sanctions were imposed or to what conditions those sanctions subjected him. See *Kucinsky*, 2020 IL App (3d) 170719, ¶ 82 (finding the defendant failed to sufficiently allege he was deprived of a liberty interest where he failed to allege how long he remained in administrative segregation or how long

- 20 -

he experienced the alleged harsh conditions of confinement). Under these circumstances, Harris has failed to state a cause of action based upon the deprivation of a state-created liberty interest. Again, we find dismissal of his third amended complaint was warranted under section 2-615 of the Code.

¶ 62                                    III. CONCLUSION

¶ 63            For the reasons stated, we affirm the circuit court's judgment.

¶ 64            Affirmed.